644 S.E.2d 735

The **VESTRY AND CHURCH WARDENS OF the CHURCH OF the HOLY CROSS, a South Carolina Corporation, Inc., Appellant,**

v.

**ORKIN EXTERMINATING COMPANY, INC., Respondent.**

No. 4198.

Court of Appeals of South Carolina.

Heard Dec. 5, 2006.

Decided Jan. 16, 2007.

Rehearing Denied May 17, 2007.

Thomas S. Tisdale, Jr. and David J. Parrish, both of Charleston, for Appellant.

Wade R. Marrionneaux, of Atlanta, GA; J. Rutledge Young, III and John Massalon, both of Charleston; and Kenneth R. Young, of Sumter, for Respondent.

GOOLSBY, J.:

This action arises out of a termite contract that the Church of the Holy Cross had with Orkin Exterminating Company and the discovery by Holy Cross that a termite infestation had damaged its historic church building. The jury found for Orkin after a long trial involving issues related to the construction of the church building, the adequacy of annual inspections conducted by Orkin, the degree of termite damage sustained by the church building, and the cost of repairing the damage. Holy Cross appeals the denial of its motion for a

new trial based on juror misconduct. We reverse and remand for a new trial.

At the start of the trial, the trial judge instructed the jurors that they should not discuss the case among themselves, should not discuss the case with anyone else, and should not attempt to investigate the case on their own. A day after the trial ended in a jury verdict in Orkin's favor, an alternate juror contacted the trial judge and told him that "possible" misconduct by one of the jurors had occurred during the trial of the case. The report prompted the trial judge to meet with the alternate juror to discuss her allegations. Afterward, the trial judge addressed a letter to all counsel apprising them of the alternate juror's allegations, allegations that in no way implicated either party or suggested wrongdoing by either party.

According to the letter, the alleged misconduct, which the alternate juror later confirmed under oath, consisted of the offending juror "early in the trial ... question[ing] aloud the instructions that she was not to talk about the case ... because everybody knew what was going on"; commenting to the other jurors "that everyone knew that the historic people 'have money' and are simply trying to get someone else to 'pay their bills' " and "that 'old buildings fall down' simply because of age"; telling the other jurors "that she did not know why she had to hear both sides of the case and that she had discussed it with her mother who reaffirmed that the historic people have money and should clean up their own mess"; remarking to the other jurors that she had talked with a painter friend who told her that walls could collapse due to hidden termite damage; declaring to the other jurors "that they should tear down the church and bring in a double wide"; indicating to the other jurors "that she had talked with her minister about the situation" but then retracting her statement "to say that she and the minister simply prayed about her service and she had asked for guidance in making a decision"; and disclosing to the other jurors that she had gone out to the church and looked at it and that it "looked fine to her." The jurors reportedly admonished the offending juror about discussing the case, "laughed off" her comments, "[told] her to stop," and "paid her no attention."

Upon learning of the alternate juror's allegations, Holy Cross moved for a new trial based on juror misconduct.

The trial judge later conducted a hearing at which he summoned the jurors to appear. After questioning the jurors in the presence of counsel for both parties regarding the allegations made by the alternate juror, the trial judge held the comments and actions by the offending juror did not prejudice Holy Cross in such a way as to "affect[ ] the impartiality of the verdict" and that "[i]n fact, all other jurors [1] indicated that her actions had no impact on their individual decisions." [2] Whereupon, the trial judge denied the motion by

---

1. We note the dissent quotes a different portion of the trial judge's order in which the judge states, "All of the jurors indicated that no improper conduct or outside influences tainted their unanimous verdict." As the dissent points out, however, the trial court did not examine the offending juror so the trial judge's reference to "all" applies to the remaining jurors, not to all twelve.

2. Three jurors, however, indicated at one point in their examination by the trial judge that the offending juror's comments had influenced them. The first juror testified as follows:

   Court:  ... Were you in any way influenced by the things that she said?

   Juror: Yes.

   Court: In what way?

   Juror: She just kept talking about church, you know, helping churches and ...

   Court: Right.

   Juror: And that she talked to her pastor and he was going to pray for us, but he knew that it was the right thing for us to do.

   Court: What was the right thing for you to do?

   Juror: To just let the church get other churches to help.

   Court: And were you convinced by what she said or by what her pastor said that that was the right thing to do?

   Juror: No, but I guess, you know, I couldn't help but hear it, I heard it so much.

   Although perhaps not "convinced" (the trial judge's word) by anything that the offending juror said, the first juror nonetheless admitted to being "influenced" (again, the trial judge's word) by those comments. Improper influence, however slight, is still improper influence, or as Paul writes in *Galatians* 5:9(RSV), "A little leaven leavens the whole lump."

   Admittedly, the juror later backed off slightly on her admission of influence. When pressed by the trial judge about whether the offending juror's comments "influenced [her] in making a decision," she indicated they had done so; but then, when pressed further, she qualified her answer, saying that she was "still not sure" and "I *don't think* I based my decision on anything she said." [Emphasis added.] In other

Holy Cross for a new trial. In a separate order, the trial judge held the offending juror in criminal contempt for "making impermissible comments to other jurors prior to the jury's proper deliberations."

The basic issue here, as we see it, is whether the juror misconduct in question affected Holy Cross' right to fundamental fairness at trial.[3] More to the point, did the juror misconduct at issue in this case so affect the jury's impartiality as to deprive Holy Cross of a fair trial?[4] We recognize that what constitutes improper juror behavior as will warrant a new trial must be determined by the facts and circumstances of each case.[5]

The trial judge here mainly focused, particularly in his questioning of jurors, not upon the offending juror but upon the other eleven and the effect that the offending juror's comments and actions had upon them. The question, however, of whether the offending juror's comments and actions had any influence upon the other jurors is not the sole determining factor as to whether the misconduct warrants a new trial. A jury, after all, is composed of *twelve*, not eleven, jurors, and it

---

words, she could not tell the trial judge definitively whether the offending juror's comments impacted her decision in the case or not. Suffice it to say, the juror never testified that the comments and actions of the offending juror "had no impact" on her individual decision.

Like the first juror, the other two initially acknowledged the offending juror's comments had indeed influenced them, at least somewhat. One of these said, when asked whether what the offending juror said "ha[d] any bearing on [the juror] making up [her] mind one way or the other," replied, "A little. She shouldn't have said nothing, you know, to the jury about it." This juror later testified, however, that what the offending juror said did not cause her to decide the case "one way or another." The other juror, when asked whether what the offending juror told her "ha[d] any bearing on [her] decision," answered, "Well, I can't say that it didn't, you know, come in my mind, you know.... But I think—I still made my decision based on the facts."

3. See *Alston v. Black River Elec. Coop.*, 345 S.C. 323, 326, 548 S.E.2d 858, 859 (2001) ("Under South Carolina law, litigants are guaranteed the right to an impartial jury.")

4. See *State v. Kelly*, 331 S.C. 132, 141, 502 S.E.2d 99, 104 (1998) ("Unless the misconduct affects the jury's impartiality, it is not such misconduct as will affect the verdict.")

5. 66 C.J.S. *New Trial* § 54, at 143 (1998).

acts as a unit [6]; thus, "the misconduct of any juror, actual or implied, which ... prevents a fair and proper consideration of the case is misconduct of the entire jury, vitiating its verdict and requiring a new trial." [7]

In this case, the offending juror pointedly ignored the trial judge's admonition for the jury to refrain from discussing the case until both sides could be heard from. Aside from engaging in discussions with at least three outsiders about the case, the offending juror made statements to her fellow jurors early on and before the submission of the case about matters that were not based on the evidence, that manifested views openly hostile to Holy Cross, and that, one may reasonably presume, influenced her. [8] Moreover, she undertook her own investigation into the facts when she drove out to the church without the authority of the court or the consent of the parties.

The prohibition against jurors discussing a case until the trial judge submits it to them for deliberation and decision [9] involves, our supreme court has held, a matter of fundamental fairness. [10] The prohibition is meant to insure that jurors

---

6. As Winston Churchill once observed, "The scrutiny of *12* honest jurors provides defendant and plaintiff alike a safeguard from arbitrary perversion of the law...." 2 J. Kendall Few, *In Defense of Trial by Jury* 395 (American Jury Trial Foundation 1993) (emphasis added).

7. 66 C.J.S. *New Trial* § 54, at 144.

8. *See id.* § 58, at 147 ("According to some decisions a new trial must be granted if a juror joined in a discussion of the case; but according to others it must be shown that statements were made which might reasonably be presumed to have influenced the juror." (footnote omitted)).

9. As early as in the second day of an extended trial, which lasted from August 8 through August 22, 2005, the offending juror reportedly told one of the other jurors:

    [T]he second day she said ... we really don't have to go any further with this because the church should take care of the church.... [S]he ... [s]aid she talked to her preacher that night and he advised her ... that churches need to stick together and help churches out. .... [S]he felt that way from day one.

    Another juror testified he recalled the offending juror "maybe at the beginning saying that, you know, she kind of had her mind set [sic] up and again, when I started hearing different things about going, visiting the church."

10. *State v. Aldret*, 333 S.C. 307, 311, 509 S.E.2d 811, 813 (1999); *State v. McGuire*, 272 S.C. 547, 551, 253 S.E.2d 103, 105 (1979); *cf. Prov-*

remain impartial throughout the entire trial and that they hear both sides of a controversy before making up their minds and rendering a verdict. There are, after all, at least two sides to every story.

■ An examination or investigation by a juror conducted without the authority of the court or consent of the parties of a place or object that is the subject of conflicting evidence may provide a basis for a new trial.[11] Although she may not have learned anything from her visit to the site that she did not already know and her report to the other jurors of her actions may not have had any impact on them, the offending juror's attempt to conduct an unsanctioned investigation into the facts of this case, when viewed with her other acts and comments, shows a juror unconcerned about granting Holy Cross the fair and impartial trial to which it was entitled.[12]

A fair and impartial juror the offending juror clearly was not, particularly since it appears she made up her mind early on in the trial and before presentation of all the evidence.

We therefore hold that under the circumstances of this case, which involves several acts of juror misconduct and where at least one of those acts was deemed so egregious by the trial judge that he punished the offending juror for criminal contempt, the failure of the trial judge to grant a new trial based upon those acts of misconduct amounts to an abuse of discretion.[13] While we recognize the burden our decision places upon Orkin, which bears no responsibility for what occurred,

---

*erbs* 18:17(RSV) ("He who states his case first seems right, until the other comes and examines him.").

11. 66 C.J.S. *New Trial* § 61, at 149–50.

12. *See id.*, at 150 (stating the question of whether to grant a new trial for misconduct involving an improper site investigation by a juror depends on the circumstances of the particular case).

13. *See* 75B Am.Jur.2d *Trial* § 1639, at 409 (1992) (stating a trial court's determination regarding juror misconduct is reviewable for an abuse of discretion); *see also Bishop v. Nicholson,* 146 S.C. 245, 248, 143 S.E. 802, 803 (1928) (Blease, J., concurring) (indicating the standard of review in a juror misconduct case is an abuse of discretion standard); 66 C.J.S. *New Trial* § 54, at 143 ("Separate acts of misconduct may be sufficient, when combined, to require a new trial, although one of such acts alone would not be sufficient.").

we believe fundamental fairness demands Holy Cross be given a new trial.[14]

**REVERSED and REMANDED.**

KITTREDGE, J., concurs.

STILWELL, J., dissents in a separate opinion.

STILWELL, J., (dissenting):

I respectfully dissent.

The focus of the majority opinion is principally upon the one juror who unquestionably is guilty of misconduct and violated the clear instructions of the court.

However, I believe, as did the trial judge, and as the state supreme court has instructed us, that the focus should be on what influence the miscreant juror's actions had upon the remaining jurors and whether her conduct prejudiced the outcome of the trial to such an extent that the parties did not receive a fair trial. *See State v. Grovenstein,* 335 S.C. 347, 352, 517 S.E.2d 216, 218 (1999) (finding misconduct that does not affect the verdict does not entitle a party to a mistrial). *See also State v. Zeigler,* 364 S.C. 94, 108, 610 S.E.2d 859, 866 (Ct.App.2005) (stating "[t]he general test for evaluating alleged juror misconduct is whether there in fact was misconduct and, if so, whether any harm resulted to the defendant as a consequence.").

The errant juror's activities were initially reported to the trial judge by an alternate juror, after the jury verdict was received. That juror, being an alternate, was in no position to testify of her own knowledge as to what influence, if any, the misconduct had upon the other jurors during the deliberations that resulted in the verdict, as she would necessarily have

---

**14.** *See Bishop,* 146 S.C. at 247, 143 S.E. at 802 (affirming a trial judge's grant of a new trial based on the disqualification of *one* juror where, after the trial, the plaintiff discovered one of the jurors had not disclosed he was employed at a mill where the defendant was president, even though the trial judge had specifically disqualified all persons employed by the mill from serving on the jury); *id.* at 248, 143 S.E. at 803 (concurring Justice Blease remarking, "[T]he jury box must not only be kept pure, but ... *each individual juror* ought to be above the least suspicion." (emphasis added)).

been dismissed prior to the court submitting the case to the jury. It is worth noting that none of the jurors who actually took part in the deliberations thought the misconduct egregious enough to report it to the court.

The eminent trial court judge, following the procedure described by the state supreme court in *State v. Aldret*, 333 S.C. 307, 509 S.E.2d 811 (1999), held an extensive evidentiary hearing, assembling the jurors, minus the offending juror, and conducting voir dire to ascertain the nature and extent of the alleged misconduct and to determine if any of the misconduct affected the jury's impartiality so as to undermine the verdict.[15]

Without reiterating the testimony of each individual juror and belaboring that issue, suffice it to say that the trial court made specific findings of fact to the effect that "[a]ll of the jurors indicated that no improper conduct or outside influences tainted their unanimous verdict." Continuing, the court stated it had "previously concluded in Order recorded on November 10, 2005 that Ms. Abrams (the miscreant juror) had violated the instructions of the Court by making improper comments to other jurors and she was sanctioned as a result of her actions. However, the Court found at that time, and reaffirms by this Order, that the action of Ms. Abrams did not taint the judicial process or impact improperly on the jury's unanimous verdict."

The remarks made by the trial court judge at the hearing resulting in the contempt citation to the offending juror are illustrative of his factual conclusions:

The comments that were made in the jury room obviously were not heard by everybody. And many of the jurors heard nothing at all. And to their credit it appears that the jurors who did hear it did not respond to it in any way and did not act on it in their deliberations. The jurors ...

---

**15.** In *Aldret,* the supreme court established a review process for juror misconduct that becomes apparent after the jury's verdict. The court authorized the trial court to consider affidavits and conduct an evidentiary hearing. 333 S.C. at 315, 509 S.E.2d at 815. Although this court found *Aldret* requires a hearing only where the misconduct is premature deliberation, this court did not conclude an *Aldret* hearing held for other types of misconduct would constitute error. *See Long v. Norris & Assocs., Ltd.,* 342 S.C. 561, 574, 538 S.E.2d 5, 12 (Ct.App.2000).

unanimously said that they did not take those comments into account in their decision in this particular case.

. . .

I'm convinced that they did not taint the process, but I have only been convinced by doing what we have done, that is to talk with each one of these jurors individually, to inquire about them, to take more of their time away from their jobs as well, to make sure that ... the process has not been tainted by these improper discussions, deliberations, comments if you will, and actions on behalf of Mrs. Abrams.

These findings of fact were made by an experienced trial court judge who was in a position not only to view the jurors as they testified, but also to have the additional benefit of personally conducting the examination, circumstances that allowed him to better evaluate their responses, both verbal and non-verbal, and thereby judge their credibility. These are findings of fact that are entitled to great deference. *State v. Harris,* 340 S.C. 59, 63, 530 S.E.2d 626, 628 (2000).

I fear the majority opinion inadvertently injects into its analysis a "presumption of prejudice," thereby resurrecting a concept already specifically rejected. *See Grovenstein,* 335 S.C. at 352, 517 S.E.2d at 218 (holding moving party has burden to demonstrate prejudice and adopting a "presumption of prejudice" standard is erroneous).

I would affirm.